United States District Court
Southern District of Texas

**ENTERED**

November 30, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DIANA JUAREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-1736 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 15) and Defendant's Cross-Motion for Summary Judgment (Doc. 16). The court has considered the motions, Defendant's response (Doc. 19), the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income under Title XVI of the Social Security Act ("the Act").

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 20, Ord. Dated August 30, 2016.

## A.  <u>Medical History</u>

Plaintiff was born on January 25, 1969, and was forty-four at the time of the administrative hearing in this case.[2]  Plaintiff earned a high school diploma in May 1987 and worked as a receptionist and office manager for Psych Management Solutions, a mental health clinic, from 1995 to July 2011.[3]  Plaintiff was also employed as a janitor by the company that cleaned the office of Psych Management Solutions at night.[4]  She performed this janitorial job for about eight years, up until early 2011.[5]  Plaintiff was laid off from her position as office manager on July 24, 2011, after the psychiatrist retired.[6]  She began receiving unemployment benefits from the State of Texas at that time.[7]

### 1.  Physical Impairments

Prior to the alleged disability onset, Plaintiff sought treatment for back pain at the Stokes Chiropractic Center from May 8, 2003, to March 11, 2011, and again on January 15, 2013, after the alleged disability onset date.[8]

---

[2]    See Tr. of the Admin. Proceedings ("Tr.") 37.

[3]    See Tr. 37, 39, 43.

[4]    See Tr. 42.

[5]    See Tr. 42, 44.

[6]    See Tr. 43, 386.

[7]    See Tr. 140-42, 478.

[8]    See Tr. 356-84, 763-69.

On January 4, 2011, Plaintiff sought treatment for abdominal pain at a gastroenterology clinic and saw Ruchir Patel, M.D., ("Dr. Patel") and Joseph Sellin, M.D., ("Dr. Sellin").[9] She complained that the pain was "centrally located," and "worse [after] meals," especially after she ate fried food.[10] Plaintiff also stated that she was having five to six bowel movements every day.[11] Dr. Sellin diagnosed Plaintiff with irritable bowel syndrome and recommended certain dietary changes including refraining from eating dairy, carbonated, or cruciferous foods.[12] Plaintiff was prescribed Bentyl, a medication designed to treat irritable bowel syndrome.[13] Plaintiff had previously been prescribed Helidac, which she reported caused a "slight improvement in her symptoms."[14]

A few weeks later, on January 18, 2011, Plaintiff attended the Strawberry Clinic for a routine visit.[15] Puja M. Dutta, M.D., ("Dr. Dutta") conducted a physical exam and did not find anything unusual related to her physical condition.[16] The relevant conditions noted by Dr. Dutta were gastroesophageal reflux disease and irritable

---

[9]     See Tr. 408.

[10]    See Tr. 409.

[11]    See id.

[12]    See Tr. 408-10.

[13]    See id.

[14]    See Tr. 409.

[15]    See Tr. 401.

[16]    See id.

bowel syndrome.[17]

On September 18, 2012, Plaintiff underwent a disability determination services examination and evaluation by Milton Kirkwood, D.O., ("Dr. Kirkwood").[18]   Dr. Kirkwood found that Plaintiff's "chief disability" was her back pain.[19]   Overall, he found that Plaintiff's conditions consisted of low back pain with an unknown cause and acid reflux.[20]   Dr. Kirkwood performed a musculoskeletal exam and a neurological exam which revealed that Plaintiff had normal muscle tone and strength in her upper and lower extremities.[21]   Her grip strength was at +5/5.[22]   Dr. Kirkwood found that Plaintiff's "[r]ange of motion [was] good in her lumbar spine" and found "no evidence of rotoscoliosis," a condition where the spine is both laterally and rotationally deviated.[23]   After Plaintiff's neurological exam, Dr. Kirkwood found that Plaintiff's deep tendon reflexes in her arms and legs were +2/4 and that she was not experiencing any radiculopathy, a nerve root disorder.[24]

Dr. Kirkwood concluded that her alleged disability was "based

---

[17]     See id.

[18]     See Tr. 386-89.

[19]     Tr. 386.

[20]     See Tr. 388.

[21]     See id.

[22]     See id.

[23]     Id.

[24]     See id.

primarily on her subjective complaints of low back pain" and that Plaintiff could "certainly sit, stand, and move about as well as lift, carry, and handle objects."[25]   Dr. Kirkwood found that Plaintiff's impairments required her to "take periodic rests" and "change positions" to alleviate her back pain.[26]  Dr. Kirkwood did not find that Plaintiff had spasms or atrophy in her back.[27] Additionally, Dr. Kirkwood said that Plaintiff had "no loss of motor or sensory reflexes" related to her spine.[28]   Dr. Kirkwood concluded that there was nothing unusual in the way that Plaintiff walked or stood and that she had no speaking or hearing problems.[29]

Plaintiff also had a magnetic resonance imaging ("MRI") of her back on September 18, 2012, by Yasmin Alexander, M.D., ("Dr. Alexander").[30]   This MRI revealed that Plaintiff had a "moderate loss of disc height" at the base of her spine, the lumbosacral joint.[31]  The MRI also revealed that bilateral pseudoarthrosis, a condition involving bone fractures, and pars defects, a precursor to spondylolysis, in her lower spine.[32]

---

[25]     Id.

[26]     Id.

[27]     See id.

[28]     Id.

[29]     See id.

[30]     See Tr. 390.

[31]     Id.

[32]     See id.

On December 12, 2012, Plaintiff returned to the Strawberry Clinic seeking a refill of her prescriptions.[33]  Plaintiff was continued on Bentyl (irritable bowel syndrome), Helidac (ulcer), Tylenol with Codeine (pain), and Nexium (acid reflux).[34]

On February 7, 2013, Plaintiff returned to the clinic, complaining of back pain.[35]  Plaintiff was diagnosed with back pain, obesity, and epigastric abdominal pain.[36]   Dr. Kuncharapu told Plaintiff to "begin [a] progressive daily exercise program, follow a low fat, low cholesterol diet, attempt to lose weight, reduce exposure to stress, improve dietary compliance."[37]

On February 19, 2013, Plaintiff sought treatment at an emergency room after falling and injuring her left knee.[38] Plaintiff later followed up with Dr. Kenneth Barning, M.D., ("Dr. Barning") on February 22, 2013.[39] Dr. Barning noted that the x-ray taken at the emergency room did not show any knee problems.[40] Nonetheless, Dr. Barning referred her for an MRI of the knee and to

---

[33]     See Tr. 400.

[34]     See Tr. 400, 493.

[35]     See Tr. 457, 464.

[36]     See Tr. 457.

[37]     Tr. 464.

[38]     See Tr. 51, 457.

[39]     See Tr. 587.

[40]     See id.

return after the MRI was performed.[41]

Plaintiff had MRIs of her knee and back at Memorial MRI & Diagnostic on March 20, 2013.[42]  The results of the back MRI showed a right disc protrusion between her L4 and L5 vertebrae.[43]  The MRI also revealed that Plaintiff had "[d]ecreased intervertebral disc height," anterolisthesis, and grade 1 spondylolisthesis and bilateral spondylolysis.[44]

Plaintiff returned to the Strawberry Clinic on March 25, 2013, and met with Dr. Kuncharapu.[45]  Dr. Kuncharapu documented Plaintiff's back pain and referred her to a neurosurgeon.[46]  Dr. Kuncharapu also made note of Plaintiff's left knee complaints including swelling, "decreased extension," and "mild tenderness" after her fall in February.[47]  It was noted that Plaintiff was attending physical therapy.[48]  In Dr. Kuncharapu's instructions to Plaintiff, she mentioned "[w]eight lifting precautions" for Plaintiff and also reiterated her earlier instructions to Plaintiff

---

[41]     See Tr. 588.

[42]     See Tr. 608-12.

[43]     See Tr. 602.

[44]     Id.

[45]     See Tr. 566-67.

[46]     See Tr. 569.

[47]     Tr. 567-68.

[48]     See Tr. 567.

7

about losing weight and improving her diet.[49]

On April 15, 2013, Plaintiff visited Dr. Barning to review the results of the knee MRI.[50]  Dr. Barning found that there had been a complete anterior cruciate ligament ("ACL") tear in her left knee and referred Plaintiff to an orthopedist.[51]  Dr. Barning also noted that there was "[m]ild cartilage thinning" and a "[m]ild lateral capsular sprain."[52]  According to Dr. Barning's notes, Plaintiff was experiencing "severe pain in the left knee with swelling" and was having trouble walking normally.[53]

Plaintiff went to a neurosurgery clinic and met with Adaeze A. Agbor, PA ("Agbor") on May 15, 2013.[54]  At this appointment, Agbor noted that Plaintiff complained of radiculopathy, a nerve-related disorder, which Plaintiff reported she had experienced for ten years, but had amplified over the previous year.[55]  Plaintiff also complained that she was experiencing "worsening numbness radiating from [her] right posterior thigh" to the top of her foot.[56] Plaintiff stated that she was having back pain upon moving and that

---

[49]    Tr. 572.

[50]    See Tr. 560, 608.

[51]    Tr. 560-61.

[52]    Tr. 560.

[53]    See id.

[54]    See Tr. 520.

[55]    See id.

[56]    Id.

she could not lift more than twenty pounds.[57]   Agbor noted that
Plaintiff was experiencing grade 1 anterolisthesis, a condition
where part of the vertebrae slips in relation to the vertebrae
directly below it.[58]   Agbor also diagnosed Plaintiff with "decreased
intervertebral disc height" and foraminal stenosis, a condition
where open spaces in the lower spine are narrowed.[59]

Agbor concluded that there was no need for neurosurgical
intervention.[60]   Agbor referred Plaintiff for an epidural steroid
injection, presumably to help with the pain, and recommended
physical therapy.[61]   Agbor also advised that Plaintiff should keep
taking Gabapentin, a drug used to treat nerve pain, and that she
should return if her symptoms became worse.[62]

On June 27, 2013, Plaintiff went to the Doctors Hospital
Tidwell for a left knee arthroscopy and ACL reconstruction by Mark
S. Sanders, M.D., ("Dr. Sanders").[63]   Dr. Sanders stated that
Plaintiff "tolerated the procedure well" and that "[c]omplications
were absent."[64]   According to the records, Plaintiff completed two

---

[57]   See id.

[58]   See Tr. 522.

[59]   Tr. 520.

[60]   See Tr. 522.

[61]   See id.

[62]   See id.

[63]   See Tr. 620-25.

[64]   Tr. 625.

months of physical therapy immediately after this knee surgery.[65]

Plaintiff saw Steven Goldstein, M.D., ("Dr. Goldstein") on August 26, 2013, "for evaluation of headaches, memory loss," and back and neck pain.[66] Dr. Goldstein remarked that he believed that "some of [Plaintiff's] difficulty with memory was related to complex partial seizures related to her previous head injury" and stated that he would "consider anticonvulsant medication."[67] Dr. Goldstein also mentioned that Plaintiff had a "full range of motion in her lumbar spine" and "no neurologic deficit present in either the upper or lower extremity."[68] Plaintiff returned to see Dr. Goldstein on September 13, 2013, and he noted that Plaintiff's headaches were "much improved."[69] Dr. Goldstein recorded that she was still having memory problems which he attributed to her "stress and pain."[70] Plaintiff reported that she was still having knee problems.[71]

Plaintiff was admitted to the Memorial Hermann Hospital via the emergency room on September 1, 2013, citing worsening knee

---

[65]    See Tr. 631.

[66]    Tr. 643.

[67]    See id.

[68]    Id.

[69]    See Tr. 644.

[70]    Id.

[71]    See id.

pain.[72]   Plaintiff said that she had been experiencing pain and
swelling in her left knee for a month.[73]   Plaintiff said that these
symptoms were greater if she moved her knee.[74]   Plaintiff "denie[d]
an injury" caused these problems.[75]   Plaintiff was discharged two
days later, on September 3, 2013, with prescriptions for
Hydrocodone (pain) and Colace (constipation).[76]   Plaintiff was also
given a referral to an orthopedic surgeon.[77]

On September 5, 2013, an x-ray was taken of Plaintiff's knee
that demonstrated "[p]ostoperative changes" and a "[m]ild medial
joint compartment narrowing."[78]

On September 19, 2013, Plaintiff submitted to another MRI of
her knee.[79]   This MRI revealed that there was "significant tearing
of the mid body of the medical meniscus" and "moderate joint
effusion" (swollen joints).[80]

Plaintiff was referred to David Crumbie, ("Dr. Crumbie") for
a second opinion on her knee, and had her first appointment with

---

[72]   <u>See</u> Tr. 531.

[73]   <u>See</u> Tr. 531, 552.

[74]   <u>See</u> Tr. 552.

[75]   <u>Id.</u>

[76]   <u>See</u> Tr. 543.

[77]   <u>See</u> Tr. 543.

[78]   Tr. 629.

[79]   <u>See</u> Tr. 627.

[80]   <u>See</u> Tr. 628.

him on September 23, 2013, where he evaluated the knee, devised a plan for physical therapy, and set goals for improving knee functionality.[81]   At this appointment, Plaintiff reported that she was having "pain and difficulty with stairs, squatting, [and] kneeling."[82]   An x-ray and the physical exam by Dr. Crumbie confirmed that Plaintiff had "a significant knee issue" and that her earlier surgery potentially failed to the point where she might need another surgery in the future.[83]   Dr. Crumbie diagnosed Plaintiff with "moderate loss of knee flexion [range of motion], and minimal loss of knee extension [range of motion]."[84] Additionally, Dr. Crumbie noted that she had "moderate [lower extremity] weakness and moderate quad weakness."[85]   However, Dr. Crumbie was reluctant to perform another surgery because he was concerned "that more surgery at this point would just worsen [her significant quad delay] and exacerbate decline and function of her extremity."[86]   Therefore, Dr. Crumbie recommended that Plaintiff follow the physical therapy plan and massage the surgical scar to decrease the scar tissue.[87]   He did note, however, that his

---

[81]   <u>See</u> Tr. 631-33.

[82]   <u>Id.</u>

[83]   Tr. 636.

[84]   Tr. 633.

[85]   <u>Id.</u>

[86]   Tr. 636.

[87]   <u>See</u> <u>id.</u>

"suspicion [was] that at some point after she regain[ed] some level of strength and function that she [would] need a revision surgery to have proper function of the extremity."[88]

As of the time of the hearing, Plaintiff was taking fourteen medications:  Plaintiff was taking Tylenol-Codeine for pain relief, Adderall for ADHD, Amitriptyline for depression, Butalbital-Acetaminophen for migraines, Butrans for pain, Cetirizine for allergies, Cymbalta for depression, Dicyclomine for irritable bowel syndrome, Hydrocodone for pain, Neurontin for seizure disorders, Nexium for gastroesophageal reflux disease, Niravam for anxiety, Prednisone for inflammatory disorders, and Tramadol for pain management.[89]

### 2. Mental Impairments

Plaintiff was diagnosed with attention deficit hyperactivity disorder ("ADHD") in 1990 when she was a participant in an Adderall study.[90]  She was prescribed this medication by her employer, Psych Management Solutions, along with Xanax and Ativan to help with insomnia.[91]  She stopped taking these medications when she was laid off in July 2011.[92]

---

[88]   Id.

[89]   See Tr. 214-17.

[90]   See Tr. 477.

[91]   See Tr. 484.

[92]   See id.

According to the records, Plaintiff's most recent mental impairments did not arise until late 2012.[93]  On December 12, 2012, Dr. Dutta referred Plaintiff to a psychiatrist for her reported problems with ADHD, pain, and insomnia.[94]

Plaintiff sought psychiatric treatment at the Strawberry Clinic beginning in January 2013 with Dr. Benjamin Li ("Dr. Li"), under the supervision of Dr. Jordan Romero ("Dr. Romero").[95]  Dr. Li believed Plaintiff's ADHD issues were "secondary" to her anxiety issues and that he would continue to monitor any attention problems once her anxiety was better controlled.[96]  Dr. Li found that Plaintiff was experiencing "significant anxiety and depression."[97] Plaintiff said she was dealing with a variety of "psychosocial stressors" at the time of this appointment, such as divorce from a physically and sexually abusive husband and worry over financial matters including eviction and repossession of her vehicle.[98]

Plaintiff stated that she felt "stressed/edgy/irritable" for a month and experienced "poor sleep, anhedonia, feelings of

---

[93]     See Tr. 400.  For example, Dr. Dutta found nothing unusual about Plaintiff's mental condition on January 18, 2011.  See Tr. 401. Dr. Kirkwood saw Plaintiff on September 18, 2012, and found that her "[p]sychosocial exam [was] grossly normal." See Tr. 401.

[94]     See Tr. 492.

[95]     See Tr. 483.

[96]     Tr. 484.

[97]     Id.

[98]     See Tr. 483-84.

hopelessness, low energy, poor concentration, and poor appetite."[99]
She also reported experiencing panic attacks about once a month but
was not anxious on a daily basis.[100]   Plaintiff went to this
appointment seeking previously prescribed medications including
Adderall, Xanax, Ativan, Tylenol #3, and Fioricet.[101] Plaintiff was
prescribed Zoloft and Atarax and became "visibly upset" when the
doctor would not prescribe Xanax.[102]

Plaintiff submitted to a psychotherapy assessment with a
Behavior Health Therapist, Julianne M. McGregor, MA, ("McGregor")
on January 31, 2013.[103]  From McGregor's notes, it appears that they
discussed Plaintiff's medical history, her feelings and emotions at
the time of the appointment, and her social connections.[104]
Plaintiff was "pleasant, calm, [and] cooperative" in the
appointment but was also "[t]earful" and depressed, stating that
she felt "hopeless."[105]   Plaintiff was not experiencing
hallucinations, paranoia, delusions, or suicidal or homicidal

---

[99]   Id.

[100]   See id.

[101]   See Tr. 484 (stating "Chief Complaint:  'I need to get back on my medication.'").

[102]   Tr. 484.

[103]   See Tr. 477.

[104]   See Tr. 477-78.

[105]   Tr. 478.

ideations and appeared "[a]lert [and] oriented"[106]   McGregor developed a plan where Plaintiff would attend therapy sessions for five months, and then be re-evaluated.[107]

On February 7, 2013, Plaintiff returned to the Strawberry Clinic, complaining of physical issues and problems with anxiety and depression.[108]   Dr. Kuncharapu diagnosed Plaintiff with depression with anxiety.[109]

Plaintiff returned to Dr. Romero on March 15, 2013.[110] Plaintiff reported the Zoloft and Atarax did not help with her anxiety and depression.[111]  Plaintiff became angry with Dr. Romero during the course of this appointment because he had not recorded on her chart that she had experienced a panic attack during her previous visit.[112]  Dr. Romero explained that while he observed that she was upset during the previous visit, he did not believe that her behavior constituted a panic attack.[113]   It was noted that Plaintiff remained upset that she was not able to obtain

---

[106]     Id.

[107]     See id.

[108]     See Tr. 457.

[109]     See id.

[110]     See Tr. 578.

[111]     See Tr. 579.

[112]     See id.

[113]     See id.

prescriptions for Xanax and Adderall.[114]   At the end of this appointment, Plaintiff was prescribed Cymbalta instead, as the doctor believed that this medication would help address both anxiety and pain issues.[115]

Plaintiff met with McGregor for a follow-up psychotherapy session on March 22, 2013.[116]   In the session, McGregor noted that Plaintiff was provided psychoeducation on stress management and that they discussed pleasant activities.[117]   She found that Plaintiff was experiencing moderate depression but showed no signs of anxiety.[118]

Plaintiff returned to the Strawberry Clinic to see McGregor for a third psychotherapy session on May 10, 2013.[119]   Plaintiff was given certain exercises and coping mechanisms to help her deal with her pain.[120]   McGregor noted that Plaintiff's progress toward achievement of treatment goals had regressed.[121]

Plaintiff sought psychiatric treatment from Daniel Koppersmith, M.D. ("Dr. Koppersmith") on June 6, 2013, August 15,

---

[114]   See Tr. 582.

[115]   See Tr. 579.

[116]   See Tr. 575.

[117]   Tr. 576.

[118]   Tr. 575.

[119]   See Tr. 557.

[120]   See id.

[121]   Tr. 558.

2013, and October 16, 2013.[122]  At the appointment on June 6, 2013,
Plaintiff's chief complaints were ADHD, anxiety, post traumatic
stress disorder, and major depressive disorder.[123]   Plaintiff
returned to the clinic on August 15, 2013, where her chief
complaint was ADHD.[124]   Dr. Koppersmith noted that Plaintiff
appeared well-groomed and was able to walk, stand, and sit
comfortably.[125]  He also noted that she seemed logical, was not
having any suicidal or homicidal ideations, was fully oriented,
with intact memory, attention, and concentration.[126]   Dr.
Koppersmith diagnosed her with major depressive disorder and panic
disorder.[127]  Plaintiff later returned on October 3, 2013.[128]   At
this appointment, Dr. Koppersmith made similar observations, noting
that Plaintiff appeared logical and her memory, attention, and
concentration were intact.[129]   In addition to major depressive
disorder and panic disorder, Dr. Koppersmith diagnosed Plaintiff

---

[122]   See Tr. 613-18.   The records from these appointments are difficult to read.   See Tr. 614-18.

[123]   See Tr. 617.

[124]   See Tr. 616.

[125]   See id.

[126]   See id.

[127]   See id.

[128]   See Tr. 615.

[129]   See Tr. 614.

with ADHD.[130]     Plaintiff had another appointment with Dr.
Koppersmith on October 16, 2013, when he made the same observations
as before about her behavior, but at this appointment, he diagnosed
Plaintiff with major depressive disorder, ADHD, and oppositional
defiant disorder, but not panic disorder.[131]

As of the date of the ALJ hearing, Plaintiff was taking the
following medications for her mental impairments: Adderall for
ADHD, Amitriptyline for depression, and Niravam for anxiety.

## B.   Application to Social Security Administration

Plaintiff protectively applied for disability insurance
benefits on June 7, 2012, claiming an inability to work since July
12, 2011, due to back pain and acid reflux.[132]  On August 23, 2012,
Plaintiff submitted a work history report that detailed her two
positions as office manager and office receptionist at the mental
health clinic from January 1996 to July 2011.[133]  Plaintiff stated
that she was a lead worker who supervised four employees but did
not have hiring and firing authority.[134]  Without distinguishing
between the two positions, Plaintiff described her duties as:

---

[130]    See id.

[131]    See id.

[132]    See Tr. 147, 151.

[133]    See Tr. 157-58.  In Plaintiff's testimony at the ALJ hearing,
Plaintiff also describes working as the night janitor for the clinic, but she
does not include this occupation in any of her reports submitted as evidence.

[134]    See Tr. 158.

answering the telephone, checking in patients and taking their copays; preparing charts for the doctors; communicating with insurance companies; depositing money in the bank; purchasing supplies for the office; cleaning  and maintaining the office; sending medical records; supervising the office; translating between patients and doctors; and filing and handling the patients' charts.[135]

    In the work history report, Plaintiff stated that she would perform the following physical tasks during the work day: walk for two hours; stand for two hours; sit for four hours; climb for thirty minutes; kneel for two hours; crouch for two hours; write, type, or handle small objects for four hours; and stoop for two hours.[136] She said that the heaviest weight she had to lift in this position was twenty pounds and she had to frequently lift fifteen pounds.[137] Plaintiff explained that the lifting was a result of pulling the patients' charts for the day, sorting them into boxes and refiling them at the end of the day.[138]

    On August 24, 2012, Plaintiff completed a function report in which she claimed that her conditions limited her ability to work

---

[135]    <u>See</u> Tr. 158, 164.

[136]    <u>See</u> Tr. 158.

[137]    <u>See</u> <u>id.</u>

[138]    <u>See</u> <u>id.</u>

for several different reasons.[139]    Plaintiff said she was
experiencing back pain and her back would "lock up" when she would
bend, crouch, or kneel, and that she required assistance to move
again if she sat, stood, or lay down for too long because she would
have a "pulsing[,] stabbing pain" in her lower back.[140]    Plaintiff
also claimed that she would "have to sit in [a] certain position"
and, "if [she] lift[ed] anything [,her] back start[ed] to pulse"
which would cause "stabbing pain up to [her] neck" and her back
would lock up, so she would not be able to move.[141]

In the function report, Plaintiff described her daily
routine.[142]    Plaintiff disclosed that would make breakfast, sit,
read, and then lie down.[143]    Later on, she would make lunch, do
laundry, clean, make dinner, take a shower, feed her pets, and go
to bed.[144]    She would take care of her son by cooking for him and
washing his clothes.[145]    Plaintiff said that her son would help her
take care of the pets.[146]

Plaintiff said that she was no longer "able to move furniture

---

[139]    See Tr. 165.

[140]    Id.

[141]    Id.

[142]    See Tr. 166.

[143]    See id.

[144]    See id.

[145]    See id.

[146]    See id.

around," "pick up boxes," "sit," "bend down," or "walk long distance[s]."   She said that her conditions also affected her ability to sleep, in that she could not "sleep in one position too long" because her "body [from the] waist down start[ed] to feel numb."[147]   In terms of personal care, she could perform all necessary activities with the exception of tying her shoes.[148] Plaintiff said that she needed reminders from her son and a phone alarm to help her remember to take care of her personal needs and to take medications.[149]

Plaintiff said that she spent an hour every day cooking her own meals, consisting of "complete meals with courses" and "sandwiches."[150]  She said that it did take her longer to cook due to her impairments.[151]  In addition to cooking, Plaintiff said that she also spent three hours a day cleaning the house and three hours in one day each week doing laundry.[152]  Plaintiff said her son would help her with the chores by carrying the vacuum to her, putting water in the mop bucket and emptying it, and moving the laundry baskets to and from the car.[153]  Plaintiff noted that she and her

---

[147]   Id.

[148]   See id.

[149]   See Tr. 167.

[150]   Id.

[151]   See id.

[152]   See id.

[153]   See id.

son alternated who swept or mopped and that he assisted her when she shampooed the carpet.[154]

Plaintiff reported that she spent "one hour every other day" outside the house and she was able to drive a car.[155]  Plaintiff also said that she shopped for groceries twice a month for thirty minutes each time.[156]

In terms of maintaining her personal finances, Plaintiff stated that she was able to pay bills, count change, handle a savings account, and use a checkbook and money orders.[157]  She said that her skills to handle her personal finances were unchanged by her impairments.[158]

Plaintiff stated that she was no longer able to ride a bike or play baseball because of her impairments.[159]  In terms of her social activities, Plaintiff wrote that they solely consisted of going to the grocery store and talking to her daughter on the phone on a daily basis.[160]  Since the onset of her disability, Plaintiff said she became "withdrawn, isolat[ed]" and had a "lack of interest" in

---

[154]    See id.

[155]    Tr. 168.

[156]    See id.

[157]    See id.

[158]    See Tr. 169.

[159]    See id.

[160]    See id.

social activities.[161]   She said that she needed reminders to go places but did not need to be accompanied.[162]   Plaintiff also disclosed in the function report that she had trouble getting along with people, and that she "tend[ed] to lash out," and get "angry," "upset, and "edgy."[163]  She said she acted this way because she felt frustrat[ed] from "always [being] in pain."[164]

Plaintiff stated that the following activities were affected by her impairments: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, remembering, completing tasks, concentrating, using hands, and getting along with others.[165]  In explanation of how her impairments affected the preceding activities, Plaintiff stated that she could not lift more than five pounds, climb more than one flight of stairs, squat for more than two minutes, walk more than a half a mile, bend for more than two minutes, sit for more than thirty minutes, stand for more than twenty minutes, or kneel for more than five minutes.[166]   If Plaintiff walked half a mile, she reported that she would have to rest for twenty minutes before she could begin walking again.[167]

---

[161]   Tr. 170.

[162]   See id.

[163]   Id.

[164]   Id.

[165]   See id.

[166]   See id.

[167]   See id.

24

She also had trouble using her hands to "open containers[,] lids or cans."[168]

Plaintiff also indicated that she had difficulty getting along with others because she would get "irritated" and that she had trouble with her memory because she would "forget right away."[169] She said that completing tasks would take her "all day" and she would not finish what she started.[170]  Plaintiff reported that she had no concentration and that she could only pay attention for a "very little."[171]  She indicated that she could follow written instructions somewhat but had difficulty following spoken instructions.[172]  Plaintiff indicated that she could get along well with authority figures and that she had never been fired for not getting along well with others.[173]  When asked about how she dealt with stress or changes in her routine, Plaintiff said that she could handle both well.[174]  However, she did say that in terms of "unusual behavior or fears," she felt "agitated" and impatient.[175]

The only physical assistive aid that Plaintiff used was

---

[168]   Id.

[169]   Id.

[170]   Id.

[171]   Id.

[172]   See id.

[173]   See Tr. 171.

[174]   See id.

[175]   Id.

glasses, which were prescribed in 2008.[176]   Plaintiff stated that she wore them when she drove.[177]   Plaintiff reported taking Acetaminophen with Codeine, which she indicated made her drowsy as a side effect.[178]

In the final section of the function report, Plaintiff wrote a paragraph explaining in more detail how her conditions negatively impacted her life.[179]   She said that her pain affected her life every day and it made it difficult to function on a daily basis.[180] Plaintiff said that transitioning to not working was a difficult change for her and that it was burdensome to depend on people especially when her son was not there to help her.[181]   She said that she could not afford to keep paying for her medication or for chiropractor visits after she lost her job.[182]

On October 4, 2012, Leigh McCary, M.D., ("Dr. McCary") completed a Physical Residual Functional Capacity ("RFC") Assessment.[183]   His primary diagnosis was spondylolisthesis.[184]   In

---

[176]   See id.

[177]   See id.

[178]   See id.

[179]   See id.

[180]   Id.

[181]   Id

[182]   See id.

[183]   See Tr. 391-98.

[184]   See Tr. 391.

terms of Plaintiff's exertional limitations, Dr. McCary concluded
that Plaintiff could lift and/or carry up to twenty pounds
occasionally, and ten pounds frequently.[185]   Dr. McCary said
Plaintiff could stand and/or walk with normal breaks for about six
hours in an eight-hour work day and that she could sit with normal
breaks also for about six hours in an eight-hour work day.[186]   In
terms of pushing and/or pulling, other than for lifting or carrying
an object, Dr. McCary stated that Plaintiff could do those
activities in an unlimited amount.[187]

Dr. McCary placed certain postural limitations on Plaintiff.[188]
In the Physical RFC Assessment, Dr. McCary said that Plaintiff
could occasionally, but not frequently, climb a ramp or stairs,
balance, kneel, stoop, crouch, or crawl.[189]  He found that she could
never climb a ladder, rope, or scaffolds.[190]  Dr. McCary concluded
that Plaintiff had no manipulative, visual, communicative, or
environmental limitations.[191]  Overall, Dr. McCary found that the
severity of Plaintiff's symptoms and their effects on her ability

---

[185]    See Tr. 392.

[186]    See id.

[187]    See id.

[188]    See Tr. 393.

[189]    See id.

[190]    See id.

[191]    See Tr. 394-95

to function was "partially supported."[192]

Under the additional comments section, Dr. McCary said that Plaintiff was "seeking mainly chiro[practic] care" for her back pain.[193] Dr. McCary found Plaintiff was obese, but that she walked normally without any assistive device and she did not have any major swelling of her organs.[194]   Dr. McCary said that Plaintiff had normal strength and graded her at a +5/5 for her grip strength.[195] Dr. McCary said that Plaintiff's range of motion for her spine was good and that there were no signs of rotoscoliosis or focal neurological problems.[196] In the additional-comments section, Dr. McCary noted that Plaintiff had a "moderate loss of disc height" in her lower spine.[197] Dr. McCary attributed this loss of disc height to "anterolisthesis [sic] . . . pars defects and pseudarthrosis [sic]."[198]

On October 4, 2012, a vocational consultant, Melinda Garza ("Garza"), completed a sequential vocational report about Plaintiff in conjunction with the initial decision.[199]   Garza indicated that

---

[192]    Tr. 396.

[193]    Tr. 398.

[194]    See id.

[195]    See id.

[196]    See id.

[197]    Id.

[198]    Id.

[199]    See Tr. 173.

there was past relevant work in the fifteen years prior that was sufficient to identify the correct occupations in the Dictionary Occupational Titles ("DOT"), which Garza identified as an office receptionist.[200]  Garza said that Plaintiff's RFC did rule out her ability to perform all of her past relevant jobs as described by Plaintiff but that it did not rule out her ability to perform all past relevant jobs as described in the DOT.[201]

On November 5, 2012, Plaintiff completed a disability report in connection with the appeal of the initial decision to deny benefits.[202]  In this report, Plaintiff reported that she was "physically getting worse" and doing "a lot less" to take care of her personal needs.[203]  Additionally, Plaintiff said that she was "not able to do much" in terms of her daily activities.[204]

On January 8, 2013, Dr. Kelvin Samaratunga, M.D., ("Dr. Samaratunga") completed a case assessment form related to the reconsideration after reviewing the RFC from October 4, 2012.[205] Dr. Samaratunga found that, based on the x-rays, Plaintiff did not have "sign[ificant] functional limitation" from her

---

[200]    See id.

[201]    See id.

[202]    See Tr. 177-82.

[203]    Tr. 177, 180.

[204]    Tr. 180.

[205]    See Tr. 439.

spondylolisthesis.[206]    Additionally, Dr. Samaratunga cited her medical records from December 20, 2012, which showed that Plaintiff had irritable bowel syndrome and gastroesophageal reflux disease.[207]

In relation to the reconsideration of the denial of Plaintiff's benefits, another Sequential Vocational Guide was completed by a different vocational consultant, Zachary Ham ("Ham"), on January 8, 2013.[208]   In this report, Ham made the same findings as Garza from the October 4, 2012 guide, except that he found that Plaintiff could perform all her past relevant jobs as described by her.[209]

Another disability report was completed some time in February or March 2013, where Plaintiff described changes that occurred in her condition since the November 5, 2012 report.[210]   Plaintiff stated that she was "crying a lot more" and that she was "unable to sleep due to insomnia and severe pain."[211]   Plaintiff indicated that she was beginning to have knee pain, anxiety, insomnia, and depression in addition to her back pain.[212]   She added medications

---

[206]    Id.

[207]    See id.

[208]    See Tr. 191.

[209]    See id.

[210]    See Tr. 195–201.

[211]    Id.

[212]    See id.

to those previously reported.[213]  Plaintiff said that she "was not able to do much" in terms of her ability to care for herself because of her pain and arthritis.[214]  Related to Plaintiff's daily activities, she stated that she did "a lot less" on a daily basis because of her depression.[215]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[216]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[217]  The ALJ granted Plaintiff's request and conducted a hearing on October 29, 2013, in Houston, Texas.[218]

## C.  <u>Hearing</u>

At the hearing, Plaintiff, a medical expert, Woodrow W. Janese, M.D., ("ME"), and a vocational expert, Rosalind Y. Lloyd ("VE") testified.[219]  Plaintiff was represented by an attorney.[220]

Plaintiff first explained her duties working for Psych Management Solutions.[221]  She stated that she was absent from work,

---

[213]    <u>See</u> Tr. 198.

[214]    Tr. 199.

[215]    <u>Id.</u>

[216]    <u>See</u> Tr. 80-86, 92.

[217]    <u>See</u> Tr. 93-98.

[218]    <u>See</u> Tr. 102.

[219]    <u>See</u> Tr. 14, 58-79.

[220]    <u>See</u> Tr. 14.

[221]    <u>See</u> Tr. 35.

on average, three to four times a month in the year preceding her layoff because she needed to go to doctor's appointments to address back, shoulder, and neck problems.[222]   She discontinued her janitorial job in early 2011 because of back and shoulder pain.[223] Plaintiff stated that, in the year prior to the layoff, she sought a variety of medical treatments, including seeing a chiropractor and taking medication.[224]   Plaintiff also testified that she suffered from migraine headaches once a week.[225]  She estimated that she could only pick up five pounds without experiencing back pain.[226]

Plaintiff's attorney next questioned Plaintiff about her daily activities and lifestyle.[227]  Plaintiff stated that she can put no weight on her left knee and needed to use crutches to ambulate.[228] Plaintiff related that she would lay down "at least three to five times a day."[229]  Plaintiff's sixteen-year old son lived with her, and he swept and vacuumed the floors.[230]  Plaintiff stated that she

---

[222]      See id.

[223]      See Tr. 44.

[224]      See id.

[225]      See Tr. 45.

[226]      See Tr. 49.

[227]      See Tr. 56-58.

[228]      See Tr. 52.

[229]      Tr. 56.

[230]      See id.

was able to cook light meals and make the bed.[231]  Plaintiff said
that sometimes her back "locks" causing numbness.[232]   When that
occurred, her son would help her regain sensation in her legs.[233]
Plaintiff also stated that, complying with doctor's orders, she
lost fifteen pounds and that she was continuing to try to lose
weight.[234]  Plaintiff stated that she received unemployment benefits
for a year and a half after the layoff from Psych Management
Solutions.[235]

The ME discussed the medical records related to Plaintiff's
knee injury and back pain.[236]   The ME opined that, in terms of her
back pain, Plaintiff had a "severe problem concerning her back . .
. the spondylolisthesis, but she did not meet or equal the 1.04A,
B, or C."[237]   Referencing Plaintiff's knee pain, the ME stated that
"[c]oncerning [Listing] 1.02, the trauma to her left knee, I
thought that was severe, but it should not last longer than twelve
months."[238]   Additionally, the ME stated that he concurred with Dr.
McCary's Physical RFC Assessment that Plaintiff's "RFC would be

---

[231]    See id.

[232]    See Tr. 56-57.

[233]    See Tr. 57.

[234]    See id.

[235]    See id.

[236]    See Tr. 59-62.

[237]    Tr. 61.

[238]    Id.

light . . . with occasional kneeling and bending concerning her left knee until it's recovered, which is less than twelve months."[239]   The ME noted that Plaintiff had been in psychiatric care and took related medications.[240]

In response to questioning by Plaintiff's attorney, the ME said that Plaintiff's ACL "was definitely repaired" through the surgery.[241]   Plaintiff's attorney also asked the ME whether a "significant" tear of the meniscus would cause pain, and the ME answered that it would, but the pain would be temporary and would dissipate over time unless it was reinjured.[242]   The ME said that Plaintiff's meniscus had not been repaired in the June 27, 2013 ACL surgery.[243]   When the ME was questioned why Plaintiff's treating physician prescribed Plaintiff crutches, the ME answered "[b]ecause she says she can't walk."[244]   Plaintiff's attorney attempted to question the ME on the topic of Plaintiff's medications, but the ME responded that he had not been able to look over the list provided to the ALJ.[245]

The VE testified about Plaintiff's past work history and the

---

[239]   Id.

[240]   See Tr. 63.

[241]   See Tr. 63.

[242]   See Tr. 65-66.

[243]   See Tr. 68.

[244]   Tr. 70.

[245]   See Tr. 70-73.

capability of an individual with Plaintiff's RFC to perform those
or other jobs.[246]    The VE considered Plaintiff's receptionist
position to be a semi-skilled, sedentary position, and Plaintiff's
role as office manager to be a semi-skilled, sedentary position.[247]
Additionally, the VE noted that Plaintiff had reported lifting
fifteen-pound boxes of medical charts  and copy paper when she was
working in these roles.[248]

This testimony caused the ALJ to redirect several questions to
Plaintiff.[249]  When asked about how much weight she was required to
lift in her positions as office manager and receptionist, Plaintiff
answered "twenty pounds."[250]  Plaintiff reported that on a daily
basis she pulled the patients' charts from the file room, loaded
them into file boxes, and carried them to the counter; at the end
of the day, she returned the boxes to the file room and refiled the
charts.[251]  The ALJ concurred with Plaintiff's estimate that these
boxes with the charts "could weigh twenty pounds."[252]  Plaintiff
stated that she usually moved two boxes of files per work day.[253]

---

[246]    See Tr. 73–79.

[247]    See Tr. 73.

[248]    See Tr. 73–74.

[249]    See Tr. 74.

[250]    See id.

[251]    See Tr. 74–75.

[252]    Tr. 75.

[253]    See Tr. 76.

The VE confirmed that the Dictionary of Occupational Titles would consider both the office manager and receptionist positions as sedentary.[254]   The ALJ presented the following hypothetical individual:

> Taking a hypothetical individual 44 years of age, has completed a twelfth-grade education, having a residual functional capacity from an exertional standpoint for light work as that term is defined in the code; further characterized and qualified by the limitation that bending and kneeling should not exceed the occasional during the course of the work day, occasional being defined in the usual fashion in this form.   [Would] [s]uch a hypothetically described individual be able to perform any of the past relevant work which you have identified?[255]

The VE stated that such an individual could perform Plaintiff's prior relevant work as an office manager but not her prior relevant work as a receptionist because of the duty of moving boxes.[256]

Plaintiff's attorney posed several alternatives to the ALJ's hypothetical, first asking that if "the hypothetical individual would need to elevate the left leg heart level for two to three hours per day during the normal eight-hour workday, would there be any jobs in the national economy such an individual could perform . . . on a sustained basis," to which the VE answered that there would not be jobs for that person.[257]   Plaintiff's attorney then

---

[254]   See id.

[255]   Id.

[256]   See Tr. 76-77.

[257]   Tr. 77.

asked that if the "hypothetical individual would need to lie down one to two hours per day during a normal eight-hour workday because of psychologically based symptoms or side effects of the medications, would there be any jobs in the national economy such an individual could perform" and the VE again answered in the negative.[258]   The third hypothetical interposed by Plaintiff's attorney asked that if "the hypothetical individual is absent three days per month on a continuing basis, would there be any jobs in the national economy that the [hypothetical individual] could perform . . . on a sustained basis," and the VE again answered no.[259]  Plaintiff's attorney's final hypothetical question asked if the "hypothetical individual should have no contact with the public, would she be able to perform any of her past relevant work" and the VE answered no.[260]

The hearing concluded with a short statement by Plaintiff's attorney, who stated, "[w]e contend [Plaintiff] would meet or equal 1.02A, 1.03, and 12.04.  Primarily we looked at 1.02 because the Claimant is using two crutches."[261]

## D.  Commissioner's Decision

On December 12, 2013, the ALJ issued an unfavorable

---

[258]    Id.

[259]    Id.

[260]    Tr. 79.

[261]    Tr. 79.

decision.[262]  The ALJ found that Plaintiff met the requirements of insured status through December 31, 2016, and that Plaintiff had not engaged in substantial gainful activity from July 12, 2011, the alleged onset date, to the date of his decision.[263]  The ALJ recognized the following impairments as severe: "spondylolisthesis, chronic low back pain, acid reflux disease, obesity, and irritable bowel syndrome."[264]  The ALJ recognized "depressive disorder and anxiety disorder" as nonsevere impairments.[265]

Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any Listing, according to the ALJ.[266]  In particular, the ALJ considered Listing 1.04 (disorders of the spine) in connection with Plaintiff's back issues and Listing 5.06 (inflammatory bowel disease) in connection with Plaintiff's irritable bowel syndrome.[267]

The ALJ determined from the evidence that Plaintiff's back problems did not meet or equal Listing 1.04 because neither her nerve root nor spinal cord was compromised.[268]  Additionally, the ALJ considered the three criteria under Listing 1.04 that must be

---

[262]    See Tr. 25.

[263]    See Tr. 16.

[264]    Id.

[265]    See id.

[266]    See Tr. 18.

[267]    See Tr. 18-19.

[268]    See Tr. 18.

found in addition to the compromise of the nerve root or spinal cord and found that none of these were experienced by Plaintiff.[269] The ALJ found that Plaintiff was not experiencing "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of [sic] motion of the spine, or motor loss accompanied by sensory or reflex loss and there is no positive straight-leg raising test."[270]   The ALJ also found Plaintiff was not suffering from spinal arachnoiditis or lumbar spinal stenosis.[271]

The ALJ discussed Listing 5.06, addressing each criteria and A and B of that Listing.[272]   Under Listing 5.06, a claimant would have to meet paragraph A or two criteria under paragraph B within the one six-month period.[273]   The ALJ found that Plaintiff did not provide evidence or show obstruction of stenotic areas requiring hospitalization under Paragraph A.[274]   The ALJ also found that Plaintiff had not provided evidence to meet any one of the criteria listed under Paragraph B.[275]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's alleged symptoms and her

---

[269]   See id.

[270]   Id.

[271]   See id.

[272]   See id.

[273]   See Tr. 19.

[274]   See id.

[275]   See id.

medical treatment and stated that he followed the regulatory requirements as to both.[276]  When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms.[277]

Next, the ALJ discussed the symptoms associated with her back pain, migraines, irritable bowel syndrome, knee pain and surgery, acid reflux, and obesity.[278] The ALJ considered the "intensity, persistence, or limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [Plaintiff's] functioning," and made a credibility finding that those symptoms were not substantiated by objective medical evidence.[279]

The ALJ concluded, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[280]

In support of this conclusion, the ALJ stated that the

---

[276]    See id.

[277]    See Tr. 20.

[278]    See Tr. 20-22.

[279]    Id.

[280]    Tr. 20.

longitudinal medical evidence reflected that Plaintiff was not as limited as she alleged.[281]   He also concluded that Plaintiff's allegations of symptoms and restrictions were only partially credible because "the evidence of record fails to support the level of limitations as alleged by the claimant" and because of "her receipt of unemployment benefits."[282]  The ALJ discussed Plaintiff's clinical obesity and how "no treating physician has indicated that her obesity presents an impediment or deterioration in her functional ability."[283]  The ME's opinion was given "great weight," because, as the ALJ wrote, it was "consistent with the objective clinical findings and the record as a whole."[284]

The ALJ found Plaintiff capable of performing her past relevant work as an office manager.[285]   The VE classified Plaintiff's work as a receptionist as sedentary, semi-skilled, but performed at the light level, and classified Plaintiff's work as an office manager as sedentary and skilled.[286]  The ALJ cited the VE's finding that, based on these determinations, that the hypothetical

---

[281]   See id.

[282]   Tr. 20, 23 (referring to the contradiction between the representation made in collecting unemployment that the claimant is able to work and is looking for employment and the representation in applying for disability that the claimant cannot work).

[283]   Tr. 23.

[284]   Tr. 24.

[285]   See id.

[286]   Id.

individual could perform the past relevant work as an office
manager.[287]  Therefore, the ALJ found that Plaintiff "ha[d] not been
unable to perform past relevant work since the alleged onset date
of disability," and that Plaintiff could "perform [this work] as
actually and generally performed."[288]  The ALJ concluded that
Plaintiff could not be considered disabled under the Act because
she could perform her past relevant work.[289]  The ALJ ultimately
found that Plaintiff had not been under a disability from July 12,
2011, through December 12, 2013, the date of the ALJ's decision.[290]

Plaintiff appealed the ALJ's decision, and, on April 15, 2015,
the Appeals Council denied Plaintiff's request for review, thereby
transforming the ALJ's decision into the final decision of the
Commissioner.[291]  After receiving the Appeals Counsel's denial,
Plaintiff sought review of the decision by this court.[292]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner
denying disability benefits is limited to the determination of
whether: 1) the ALJ applied proper legal standards in evaluating

---

[287]    See id.

[288]    Id.

[289]    See id.

[290]    See Tr. 24-25.

[291]    See Tr. 1-4.

[292]    See Tr. 1-4; Doc. 1, Pl.'s Compl.

the record; and 2) substantial evidence in the record supports the decision.  <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3); <u>see also</u> 42 U.S.C. § 423(d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has

done in the past must be found "not disabled;" and (5) if
the claimant is unable to perform h[er] previous work as
a result of h[er] impairment, then factors such as h[er]
age, education, past work experience, and [RFC] must be
considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20
C.F.R. § 416.920.  The analysis stops at any point in the process
upon a finding that the claimant is disabled or not disabled.
Greenspan, 38 F.3d at 236.

**B.   Substantial Evidence**

The widely accepted definition of "substantial evidence" is
"that quantum of relevant evidence that a reasonable mind might
accept as adequate to support a conclusion." Carey v. Apfel, 230
F.3d 131, 135 (5th Cir. 2000).  It is "something more than a
scintilla but less than a preponderance." Id.  The Commissioner
has the responsibility of deciding any conflict in the evidence.
Id.  If the findings of fact contained in the Commissioner's
decision are supported by substantial record evidence, they are
conclusive, and this court must affirm.  42 U.S.C. § 405(g);
Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings
exist to support the Commissioner's decision should the court
overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir.
1988).  In applying this standard, the court is to review the
entire record, but the court may not reweigh the evidence, decide
the issues de novo, or substitute the court's judgment for the

44

Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) that Plaintiff's mental impairments and knee impairment should have been considered severe; and (2) that the RFC finding of the ALJ was not supported by substantial evidence and was legal error.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.  The court discusses Plaintiff's arguments in order.

**A.   <u>Severity of Mental and Knee Impairments</u>**

Under 20 C.F.R. § 416.920(a)(4)(ii), "If you do not have a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."  The duration requirement is that the physical or mental impairments must last or be expected to last "for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

**1.  Knee Impairment**

With regards to Plaintiff's knee issues, Plaintiff argues that the ALJ erred by addressing Plaintiff's knee impairment in his

45

decision but without deciding whether it was severe.  Plaintiff contends that her knee impairment was severe.  Plaintiff additionally argues that the ALJ's RFC finding failed to take into account her knee impairment.  In making the argument that the ALJ erred in not making a finding as to the severity of Plaintiff's knee impairment, Plaintiff complains that the ALJ discussed Plaintiff's knee impairment in his decision, but did not explain why it was not a severe impairment.

### a.  The ALJ's Failure to Find a Severe Impairment

In Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987), the plaintiff raised a similar argument that the ALJ addressed her impairment but failed to find that it was severe.  However, the court found that "[t]he case did not depend upon a conclusion of the 'non-severity' of her condition . . . [because] the ALJ went on to find, pursuant to the fourth step of the sequential evaluation analysis, that appellant's impairment did not disable her from performing her past sedentary work."  Id.

In this case, the ALJ proceeded past step two and found Plaintiff not disabled under step four of the analysis because she could perform her past relevant work as an office manager.[293]  The ALJ discussed Plaintiff's knee impairment in his decision but stated that the records demonstrated that she was "expected to make good progress and regain strength and functional ability with

---

[293]    See Tr. 24.

46

therapy."[294]   The ME's testimony likewise stated that Plaintiff would recover from her knee impairment within twelve months.[295]   The ALJ's decision in this case did not depend on any finding at step two because he proceeded to step four in the analysis.   As in Adams, the ALJ in this case found that Plaintiff was able to perform her past relevant work.   The RFC determination did not hinge on a finding that the knee impairment was severe or nonsevere.   Therefore, the court rejects Plaintiff's argument that the ALJ erred in failing to make a finding on the severity of her knee impairment.

### b.  RFC Finding

Plaintiff argues that the ALJ failed to take into account Plaintiff's knee impairments in his RFC finding.   The court disagrees.

First, the ALJ limited Plaintiff to light work with only occasional bending and kneeling.   The bending and kneeling restriction demonstrated that the ALJ recognized the limitations of Plaintiff's knee impairment.   Also, the ALJ discussed Plaintiff's knee pain, fall, ACL surgery, and post-surgery problems, but found that she was "expected to make good progress and regain strength and functional ability with therapy."[296]   Finally, the ALJ looked to

---

[294]   Tr. 22.

[295]   See Tr. 61.

[296]   Tr. 22.

the ME's testimony in making his RFC finding.  The ME found Plaintiff's knee impairment to be severe, but it would not last longer than twelve months.  The ME also found that the knee injury would limit Plaintiff's ability to kneel and bend until it healed. The ALJ accepted these findings by the ME and incorporated them into his RFC.  Therefore, Plaintiff's argument that the RFC finding was not supported by substantial evidence because it did not take into account Plaintiff's knee impairments should be rejected.

### b.  New Evidence

When Plaintiff appealed her case to the Appeals Council, she submitted new physical therapy records from October 18, 2013, to August 22, 2014.  Additionally, Plaintiff submitted records from the Stokes Chiropractic Center from January 15, 2013.  Plaintiff argues in her motion for summary judgment that the new evidence to the Appeals Council demonstrated that Plaintiff had issues with her knee outside the twelve-month window and that it showed that her knee problems inhibited her ability to work.

Under 20 C.F.R. § 416.1470(b), "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision . . . . It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."  The Appeals Council,

however, does not have to address this new evidence or explain why it denied review in its decision.  Whitehead v. Colvin, 820 F.3d 776, 780 (5th Cir. 2016)(citing Sun v. Colvin, 793 F.3d 502, 511 (5th Cir. 2015)).  A court has the power to "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  New evidence is considered "material" if there is the "reasonable possibility that it would have changed the outcome of the Secretary's determination."  Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994).

There are several problems with the records submitted by Plaintiff.  Both chiropractic and physical therapy records are not considered acceptable medical sources under the regulations.  20 C.F.R. § 416.913(d); see also Johnson v. Astrue, No. H-11-563, 2012 WL 3527972, at *19 & n.4 (N.D. Tex. Aug. 14, 2012); Porter v. Barnhart, 200 F. App'x. 317, 319 (5th Cir. 2006)(unpublished)("a chiropractor is not listed [in the regulations] as an acceptable medical source")(citing 20 C.F.R. §§ 404.1513(a), 416.913(a)).  Additionally, these records are cumulative of the earlier submitted chiropractor and physical therapy records.  Plaintiff has failed to demonstrate good cause for failing to submit these records earlier and has failed to explain how these records are material to her

case.

As to Plaintiff's physical therapy records after December 12, 2013, the Fifth Circuit has held that "it is implicit in the materiality requirement that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994) (citing Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989)). Therefore, the court finds that these records are not material because they do not relate to the time period for which benefits were denied as they concern evidence of subsequent deterioration of the previously non-disabling condition. Additionally, the records are cumulative and are not from an acceptable medical source.

**2. Mental Impairments**

Plaintiff contends that the ALJ used the wrong standard to determine the severity of her mental impairments by not applying the standard set forth in Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985). Plaintiff also contends that the RFC finding failed to take into account her mental impairments. Additionally, Plaintiff argues that the ALJ's decision that her mental impairments were nonsevere was not supported by substantial evidence and that the ALJ should have ordered a psychological evaluation of Plaintiff.

**a. Standard**

A claimant only must show that she has at least "one severe impairment in order to avoid a denial of benefits at step two, [and therefore] the failure to find a particular impairment at step two is not reversible in and of itself as long as the ALJ finds that at least one other impairment is severe." Cagle v. Colvin, No. H-12-0296, 2013 WL 2105473, at *5 (S.D. Tex. May 14, 2013). A nonsevere impairment must still be considered in the ALJ's RFC finding. Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000).

In this case, the ALJ found that Plaintiff's mental impairments were nonsevere, stating, "[t]he [Plaintiff's] medically determinable mental impairments of depressive disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere."[297]

Plaintiff argues that the standard applied here in error because the ALJ did not cite Stone and applied a different standard. Plaintiff cites Scroggins v. Astrue, 598 F. Supp.2d 800 (N.D. Tex. 2009), in support of her argument. In Scroggins, the court found that the ALJ applied an incorrect standard in finding that the plaintiff's mental impairments were nonsevere. 598 F. Supp.2d at 805. There, the ALJ did not cite Stone, and applied the minimal effect standard, stating "[a]n impairment or combination of impairments is 'not severe' when medical or other evidence

---

[297]    Tr. 16.

establish only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." Id. The reviewing court stated that this was not the proper standard, and that the ALJ should have applied the following standard from Stone, "a severe impairment 'would not be expected to interfere with the individual's ability to work.'" Id. The court said that the difference between the two statements was "slight" but it was improper because it was not an "express statement" of the standard set forth in Stone. Id. at 806.

In Acosta v. Astrue, 865 F. Supp.2d 767, 780 (W.D. Tex. 2012), the court elaborated on the proper severity standard in the Fifth Circuit and discussed the split among Texas district courts, explaining that "[s]ome courts have held, often without elaboration, that a standard using the 'minimal effect' language as used in Social Security Ruling 85-28 and Social Security Ruling 96-3p is consistent with the Fifth Circuit's non-severity standard. Other courts have held to the contrary." The court in Acosta made it clear that Scroggins belonged in the latter category. 865 F. Supp.3d at 780.

The ALJ in Acosta applied the following standard to find the plaintiff's mental impairments nonsevere, "[a]n impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of

slight abnormalities that would have no more than a minimal effect on an individual's ability to work." <u>Id.</u> at 774. In deciding whether the ALJ applied the correct standard, the court looked at Fifth Circuit cases, finding that, "[these] cases reveal that since the time it adopted the slight abnormality standard, our appellate court has all along viewed that standard as providing an allowance for a minimal effect on our ability to work without also rendering the impairment severe." 865 F. Supp.3d at 782. The court found that the ALJ applied the correct severity standard when it found that the plaintiff's mental impairment was nonsevere.

Cases in the Southern District of Texas have also declined to follow the <u>Scroggins</u> line of cases, as evidenced in <u>Cagle</u>, where the court held that the ALJ's non-severity determination fell within <u>Stone</u>, when the ALJ applied a standard stating that the impairments did not "impose more than mild limitations." 2013 WL 2105473, at *5.

Therefore, the court finds that the ALJ applied the correct standard to Plaintiff's mental impairments. The court declines to follow the <u>Scroggins</u> line of cases, instead finding the reasoning in <u>Acosta</u> more persuasive. Additionally, the court finds that the language in <u>Stone</u> and the minimal limitation language applied by the ALJ have the same meaning. As stated in <u>Acosta</u>, just because the ALJ did not explicitly cite <u>Stone</u> does not require the court to remand the case. <u>Acosta</u>, 865 F. Supp.2d at 783 (citing <u>Hampton v.</u>

Bowen, 785 F.2d 1308, 1311 (5th Cir. 1986)("Stone does not require a wholesale remand of all severity cases.  A case will not be remanded simply because the ALJ did not use 'magic words.'  We remand only where there is no indication the ALJ applied the correct standard.")).

### b.  Nonseverity Finding and Substantial Evidence

In this case, the court finds that the ALJ's nonseverity finding of Plaintiff's mental impairments is supported by substantial evidence.  There is evidence in the medical records demonstrating that Plaintiff was treated for depression and anxiety through a variety of prescriptions and psychotherapy sessions. However, there is not evidence in the record that Plaintiff's mental impairments impacted her ability to work.  The medical records reflect the fact that Plaintiff did not experience hallucinations, suicidal or homicidal ideations, or paranoia. Additionally, she was observed as being logical, fully oriented, and having intact memory, concentration, and attention in her latest appointments with Dr. Koppersmith in August through October 2013.  The ME who reviewed her records did not note any psychiatric limitations, but saw that Plaintiff had been in care and taken medication.[298]  The ALJ was entitled to rely on this finding of the ME in making his severity finding.  Finally, Plaintiff's medical records make it clear that her anxiety was based on psychosocial

---

[298]   See Tr. 62-63.

stressors, and she did not experience panic attacks on a daily basis.   Plaintiff was able to take care of herself and did not report social anxiety, impairments following instructions, or periods of decompensation.   Looking at this record, the ALJ's conclusion that Plaintiff's depression and anxiety did not cause more than a minimal effect and were therefore nonsevere is supported by substantial evidence, falling in line with <u>Stone</u>.

Even if the ALJ did make an error in determining that Plaintiff's anxiety and depression were nonsevere, it is a harmless error.   The Fifth Circuit does not require "procedural perfection . . . unless it affects the substantial rights of a party."   <u>Taylor v. Astrue</u>, 706 F.3d 600, 603 (5th Cir. 2012).   In this case, the ALJ did not make a finding that Plaintiff was not disabled at step two, and proceeded to consider whether Plaintiff's mental impairments fell under any of the section 12.00C Mental Impairment Listings at step three.   The ALJ, in making his nonseverity finding, "considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the [Listings]."[299]

In <u>Cagle</u>, the court held that "[b]ecause the ALJ progressed beyond step two and considered all limitations supported by the record, to the extent there was a step two error it was harmless." 2013 WL 2105473, at *8.   The court finds the same here because,

---

[299]     Tr. 16.

even though Plaintiff's mental impairments were considered nonsevere, the ALJ considered whether they met one of the Listings and considered related limitations, such Plaintiff's irritability and concentration issues.  Therefore, even if there was an error in the ALJ's determination of the nonseverity of Plaintiff's mental impairments, it was harmless error.

### c.  RFC Finding

Plaintiff argues that the ALJ's RFC finding was not supported by substantial evidence because it did not take into account the limitations imposed by Plaintiff's mental impairments.

The court finds that the ALJ's RFC finding did take Plaintiff's mental limitations into account.  Although the ALJ's RFC finding discussion did not include mental limitations in the work context for Plaintiff, the ALJ engaged in a thorough discussion of Plaintiff's mental impairments, finding them to only impose mild limitations on Plaintiff's social functioning, concentration, and daily living activities.  The ALJ explained that his RFC finding took these mild limitations into account.[300] Additionally, as stated above, the court finds that the ALJ's findings as to Plaintiff's mental limitations were supported by substantial evidence.

### d.  Psychological Evaluation

---

[300]    Tr. 18 ("Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.")

A court will find that an ALJ's decision "is not supported by substantial evidence if the claimant demonstrates '(1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby.'" <u>Robinson v. Barnhart</u>, 183 F. App'x. 451, 454 (5th Cir. 2006)(unpublished). A claimant bears the burden of proof to establish her disability. <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1472 (5th Cir. 1989).

The law does not require the government, at its expense, to conduct a consultative examination "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." <u>Anderson</u>, 887 F.2d at 634 (citing <u>Jones v. Bowen</u>, 829 F.2d 524, 526 (5th Cir. 1987)). A consultative examination "becomes 'necessary' only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment." <u>Brock v. Chater</u>, 84 F.3d 726, 728 (5th Cir. 1996)(citing <u>Jones</u>, 829 F.2d at 526). The ALJ has discretion to decide whether to order a psychological exam. <u>Anderson v. Sullivan</u>, 887 F.2d 630, 634 (5th Cir. 1989)(citing <u>Jones</u>, 829 F.2d at 526).

In this case, Plaintiff has provided psychological records from multiple doctors covering the extent of her mental condition. In <u>Sims v. Apfel</u>, 224 F.3d 380, 381 (5th Cir. 2000), the Fifth Circuit rejected the plaintiff's argument that the ALJ "should have ordered a consultative examination to develop a full and fair

record of her psychological condition," holding that "the record contain[ed] sufficient medical and non-medical evidence upon which to base the severity of [the plaintiff's] mental problems."

In this case, Plaintiff's testimony along with the records from Drs. Li and Romero, Dr. Koppersmith, McGregor, and the testimony of the ME illuminated the limited extent of her mental impairments. The court finds that the evidence submitted by Plaintiff created a full and fair record upon which the ALJ could base his decision about the severity of Plaintiff's mental impairments. Plaintiff has not demonstrated how she was prejudiced through a failure to order a psychological examination. Therefore, the court finds that the ALJ acted within his discretion by not ordering a psychological examination of Plaintiff.

**B.   ALJ's RFC Finding**

Plaintiff makes two arguments related to the ALJ's RFC finding. First, Plaintiff contends that the RFC finding was not supported by substantial evidence because it failed to take into account her mental and knee impairments, which the court dismissed in the above sections. Second, Plaintiff argues that the ALJ erred because he did not include the limitations noted by Dr. Kirkwood related to Plaintiff's back pain in his RFC finding. Plaintiff argues that the RFC finding did not take into the following statement by Dr. Kirkwood, "[Plaintiff] does have to take periodic rests and has to change positions as to stay in any one position,

whether it be sitting, lying, or standing causes her increased back pain."[301]

In the ALJ's decision, the ALJ stated that he considered Dr. Kirkwoood's opinion and gave it "great weight."[302]  He said that Dr. Kirkwood's findings showed that Plaintiff had "no significant limitations in her ability to perform daily activities due to back pain" and that the results of this examination by Dr. Kirkwood "further undermine[d] the credibility of the claimant's statements regarding disabling symptomology."[303]

The court finds that the ALJ did take into account Dr. Kirkwood's findings as to Plaintiff's back impairments.  Dr. Kirkwood found that the stated limitations were not significant and that her alleged disability was based on "subjective complaints of low back pain."[304]  The ALJ stated that the treatment notes by Dr. Kirkwood, as well as notes from later treatments "undermine[d] the credibility of [Plaintiff's] statements" and "demonstrate[d] that [Plaintiff's] back impairment was not as severe as alleged."  The ALJ's RFC finding was supported by substantial evidence, as the ALJ took into account the findings of Dr. Kirkwood, Plaintiff's medical treatments, and the findings of the ME.

---

[301]    Tr. 388.

[302]    Tr. 21.

[303]    Tr. 22.

[304]    Tr. 388.

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 30th day of November, 2016.

_____
U.S. MAGISTRATE JUDGE